UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

BRUCE HAY

             Plaintiff,

   v.

KERA BOLONIK,

           Defendant.

</td><td>

Civil Action No.

**COMPLAINT**

**Jury Trial Demanded**

</td></tr>
</table>

## PRELIMINARY STATEMENT

1.     This is a diversity action based on breach of contract in connection with a deal to publish a book.

2.     Over the past decade, the digital revolution has eroded earnings throughout much of the publishing industry. Newsrooms have sustained mass layoffs; magazines and publishing houses have shut down; sales of books have stagnated. Between 2009 and 2019 the average advances and royalties paid to book authors fell by a stunning some 30 percent. Many authors have seen their earnings drop far more than that . (See Léon, Does It Pay to Be a Writer? N.Y. Times, January 5, 2019.)

3.     During this same period, publishers have come to rely on sensational "blockbusters" to make money. According to one leading industry participant, the book market is increasingly dominated by the "brand-name bestseller," with the result that "the rich

get richer," while everyone else in the industry gets poorer. (Quoted in Gamerman, The Year of the

Blockbuster Novel, Wall St. Journal, May 28, 2017.)

4.     This precarious, winner-take-all environment has tempted some authors to cut

legal and ethical corners in pursuit of the next bestseller. The present case arises out of the

decision of one unscrupulous writer to succumb to that temptation.

5.     Defendant Kera Bolonik ("Bolonik") is a freelance writer, a former part-time

writer and editor at *New York* Magazine.

6.     Plaintiff Bruce Hay ("Hay), for many years a professor at Harvard Law School,

entered into a contract with Bolonik to co-author a book, and to work together on television

and/or movie projects, deriving from articles Bolonik had published about Mr. Hay's life in

*New York* Magazine.

7.     The deal was that Hay and Bolonik would work closely together on the book,

which would be a serious work meeting the highest standards of journalistic nonfiction; that

the finished product would have to be mutually satisfactory to both of them; and that they

would share equally in the profits. Further, the deal was that in anticipated negotiations with

media companies for a movie or television series, they would seek those same terms for each

other.

8.     In connection with this agreement and under the conditions of co-authorship

and collaboration that were negotiated and agreed upon, Plaintiff gave Defendant access to

thousands of pages of documents from his life; gave her the names of many people who were

potential sources of information as well as extensive documentation on these people; spent

hundreds of hours discussing his life with Defendant, divulging innumerable secrets about

himself and his family; and had numerous preparatory talks with her about the book, as well as numerous joint preliminary discussions with her and media companies about possible movie or TV productions.

9.    Defendant also subjected Plaintiff to sexual harassment and manipulated him to get him to do and say things that would be helpful to her in writing the book, oftentimes at the expense of the truth.

10.    Behind Plaintiff's back, Defendant pursued a very different agenda, which she thought would generate much more money, and publicity, for herself.

11.    Without Plaintiff's knowledge, she signed a contract with HarperCollins Publishers LLC ("HarperCollins") to publish, as sole author, a book about Plaintiff's life. The book would not be the serious, balanced work of journalism she and Plaintiff had agreed upon; rather, it would be a sensational potboiler making selective use of evidence to highlight (and misrepresent) sexual and other salacious topics. Plaintiff was cut out of the project entirely: he had no right to participate in or approve the project; he was to receive none of the proceeds of sales; and he has received no part of the advances Defendant has been paid since signing the publishing contract, which on information and belief run into the six figures. Furthermore, Defendant in this process stole both a vast amount of documentation and also the intellectual property and contributions of Plaintiff.

12.    Defendant followed a comparable strategy in connection with other media projects, covertly seeking a similarly one-sided deal concerning depiction of Plaintiff's life on screen, falsely framing him as the subject rather than collaborator and co-author.

13.    Learning of these and other duplicities, Defendant's ceased contact with

Defendant, burying the moribund idea of jointly producing works of responsible journalism with someone whose regard for honesty was one of manifest contempt. He now seeks damages for the losses he has sustained from her breaches of contract.

## PARTIES

14.     Bruce Hay is an individual and a citizen of Massachusetts.

15.     Kera Bolonik is an individual and a citizen of New York.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the Plaintiff's citizenship at the time of filing was diverse from that of each Defendant, and because the amount in controversy exceeds $75,000.

14.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

**The Parties' Agreement**

15.     In July and August 2019, Defendant Kera Bolonik published two articles in *New York* Magazine.  The subject of the articles was Plaintiff Bruce Hay's conflict with two formerly close friends: Maria-Pia Shuman, a cisgender white woman, and her spouse Mischa Shuman, a transgender woman of color ("the Shumans").

16.     Plaintiff's conflict with the Shumans had originated in 2017 and 2018, when Plaintiff was contacted by individuals, and their lawyers, with a grudge against the Shumans, who intentionally misled him into falsely believing the Shumans were committing fraud. The

Shumans were doing no such thing; on the contrary, their accusers had victimized and sexually abused them, in some cases violently, and were attempting to avoid responsibility (and possible criminal penalties) by deflecting blame onto the two women.

17.     In September 2018, while Defendant was getting started on the articles that would appear next summer, Plaintiff informed her that he was planning to write a book about his experiences with the Shumans and the controversy surrounding them.  By then he had assembled thousands of pages of correspondence, non-public police documents, confidential reports of private investigators, and other relevant documents, and had identified numerous individuals with information about the subject. These convinced him that the story was far too complex to be done justice in six or seven thousand words (Defendant's maximum *New York* Magazine allotment), and required a full book-length treatment that would provide a balanced view of the evidence and avoid oversimplification.  Plaintiff also viewed the story as meriting book-length treatment because it raised important and timely issues of gender politics, violence against women, and society's treatment of transgender women.  (2018 was a high point in the "me too" movement and the moral panic over transgender rights, as state legislatures sought to "protect" girls' bathrooms from supposedly predatory trans women.) Plaintiff's previous book (a monograph on legal aspects of Nazi persecution of Jews in the 1930s and 40s) had been published some months earlier, and Plaintiff was free to begin a new book project.

18.     Upon hearing of his plan to write a book about the Shuman story, Defendant strongly urged him to take her on as a co-author.  Such a project, she said, required journalistic experience that he lacked but that she had in spades.  Plaintiff, she said, needed to work with someone who had experience interviewing sources and who could write for the general public

(in contrast to Plaintiff's academic prose directed at legal audiences).  Further, she said, a co-author could provide a degree of objectivity that Plaintiff, as a central figure in the story did not have.

19.     Defendant told Plaintiff she was the ideal co-author for the book and assured Plaintiff that everything he provided to her would be only used with his permission in the joint collaboration between them on the book project.  Defendant said, however, that she could not begin co-authoring the book until she had completed the articles, which she was contractually bound to write herself.  If Plaintiff would refrain from getting another co-author and would refrain from writing his own book, Defendant said, then she and Plaintiff could throw themselves into efficiently co-authoring a book about his story as soon as her articles were complete.

20.     Plaintiff believed Defendant would be a suitable co-author, and agreed to the conditions she had proposed. Plaintiff and Defendant had grown up in the same Illinois town; they had old friends in common; and Defendant publicly professed to share the same feminist and pro-transgender rights sympathies that Plaintiff was committed to. Given these ties, Plaintiff believed he could trust Defendant to be honest and cooperative with with him. He further believed, owing to her training at the prestigious *New York* Magazine, long celebrated (as Defendant liked to remind Plaintiff) for its investigative pieces on police corruption and other subjects, she could be relied on to adhere to the ethics and standards of professional investigative journalism — the seek all sides of a story, to separate truth from falsehood, to make scrupulous use of evidence, and to avoid inappropriate entanglements with sources, and to maintain a professional distance from the people and subjects she was writing about.

21.     Plaintiff candidly told Defendant that these were the reasons he had decided to become her co-author once her articles were done.  Defendant emphatically insisted that he was making the right choice.  She said she very much wanted to be his coauthor, and that she was better suited to the job than anyone else.  She repeatedly told Plaintiff she was honest to a fault, that he could trust her with anything, that she ardently believed in the canons of journalism just described —and that she too saw this as an important occasion for writing about gender politics and transgender rights.

22.     In fact, Defendant said, the topicality of the story made it likely that Hollywood would take an interest in it.  Defendant stated that their co-authoring arrangement could extend to joint work on such a media project, if Plaintiff wished. Plaintiff agreed that this was a good idea.

23.     In a series of phone calls and exchanges of correspondence, in early 2019 Plaintiff and Defendant settled upon the terms of their agreement. The central terms were: (1) the parties would co-author a book on Plaintiff' experiences with the Shumans and the surrounding circumstances of their lives known to Plaintiff; (2) neither party would write their own book on the subject, and neither would seek out another co-author, without first getting the other's permission; (3) work would begin on the book as soon as Defendant's articles were finished, although some portions of the articles might (or might not) make it into the book; (4) the book would be a serious work of investigative journalism, adhering to the standards set forth in paragraph 20 above; (5) the finished product would have to be satisfactory to both of them before final publication; (6) that they would share equally the duties of evidence gathering, with Plaintiff primarily responsible for collecting documents and Defendant

primarily responsible for interviewing sources; (7) that they would share equally the duties of

writing the manuscript; (8) that they would share equally all proceeds from the book and from

any movie or television representations of the story; (9) if a movie or TV deal materialized,

Plaintiff and Defendant would insist to its creators that the production was based on fact, did

not fabricate stories, and did not contain invidious stereotypes.

24.    Throughout this period, and for many months afterward, Plaintiff continued to

entrust Defendant with voluminous correspondence, personal documents that he had never

shown anyone, and non-public legal documents.  Each of these he would interpret for her if she

did not understand its significance.  As he uncovered or received new items, he passed them

along to her.

25.    Beyond that, Plaintiff shared secrets about himself and his family that he had not

told anyone. He gave her more names of numerous individuals who might have information

enabling them to serve as direct or background sources.  He spent many hours detailing to

Defendant his dealings with the Shumans and other individuals who figured into the story.  All

of these things he did on the shared understanding between Plaintiff and Defendant that he did

them for the purpose of laying the groundwork for the joint book project.

**Defendant's Exploitation and Manipulation of Plaintiff**

26.    From early on in their interactions, Defendant sought inappropriate personal,

romantic, and sexual intimacy with Plaintiff, to emotionally manipulate him into thinking the

worst of the Shumans.

27.    Bolonik applied pressure to Plaintiff whenever he rejected her sexual advances

by suggesting that perhaps she was not the best person to write this story or that it would be

hard for her to write a favorable narrative about Plaintiff if he put "roadblocks" in their relationship.

28.     Bolonik tried to convince Plaintiff that the Shumans were evil predators and became angry when Plaintiff tried to push back and discuss his complicated feelings towards the Shumans. Bolonik told him that he did not have a fraction of the feelings toward her that he did towards the Shumans "despite all [she] was doing to save [his] ass."

29.     Over time Plaintiff grew fearful that if he complained too much about her behavior or disagreed with what she said that she would abandon the project or publish something unfavorable about him. Defendant taunted Plaintiff in writing that no one would believe she was sexually harassing him if he shared what she was doing to him because "Everyone knows me as a feminist, and everyone thinks you're a creep."

30.     Defendant would often discuss her private sex life with Plaintiff asking invasive questions of Plaintiff, including asking whether he was "aroused" during the conversation. Plaintiff expressed a wish not to engage in sexual conversations and Defendant became very angry and said that she had a lot of information about him now and Harvard "might not like to hear what [she has] to say about [him]."

31.     In early 2020, Plaintiff criticized Bolonik about her lack of journalistic interest in what was happening to him at Harvard, where the conflict with the Shumans was continuing to have adverse repercussions for him and his career. In response, Bolonik sent him text messages castigating him for never showing any personal interest in her, despite all the attention she lavished on him: "I talk to you more than anyone in my life"; "When was the last time you asked what was going on w me?"

**Defendant's Private Book Deal**

32.     Unbeknownst to Plaintiff, in August 2019 Defendant wrote her own book proposal and circulated it to publishers, naming herself as sole author and making no mention of Plaintiff as a participant in the book's creation. In early September 2019, Defendant "sold" her proposed book to HarperCollins who agreed to publish it upon delivery of a satisfactory manuscript. Plaintiff was not mentioned anywhere in the contract, except as a subject of the story.  He was to receive no authorial rights or credit, and was to receive no royalties or other sales proceeds.  Upon signature of the contract, HarperCollins paid Defendant a six-figure advance; it paid nothing to Plaintiff.  Defendant gave Plaintiff no part of the advance.  Indeed, she did not reveal any of this to Plaintiff, even after the fact.  Plaintiff learned of the whole transaction a week later from a third party.

33.     This rather astounding betrayal did not represent a sudden change of heart on Defendant's part.  Rather, it had been her plan all along.  She had never intended to comply with her agreement with Plaintiff: had never intended to take him on as a co-author, or to give him any input into the manuscript, or to share any of the money that the book earned, or to comply with any of the other terms (par. 23 above) of their agreement.

34.     Least of all did Defendant intend to write, as they had agreed, a serious evidence-based work of journalism.  Rather, her objective was exactly the opposite: namely, to to write a false "true crime" melodrama that relied on dubious sources, and ignored inconvenient evidence, in order to tell a made-for-TV thriller that appealed to popular stereotypes and the audience's darkest prejudices.  Her model here was her late friend Michelle McNamara's "true crime" blockbuster *I'll Be Gone in the Dark*, which portrayed the author as

being in hot pursuit of a serial killer of innocent women in California, turning up clues that had eluded the police. The book, which reputedly had helped the police identify and prosecute the culprit, was a huge bestseller made into a hit Hollywood movie, and earned millions. Defendant's book would have the same structure: falsely portraying Defendant as hot on the trail of two deviant women, one of them transgender, who go around victimizing innocent men while escaping the notice of police; with luck, the book — by trumpeting the accusations of men (and their lawyers) who claimed to be the women's victims — would lead law enforcement to see what it had overlooked and (hopefully) incarcerate the women and take away their children, which Defendant has informed Plaintiff is a specific objective of hers. From there, McNamara-like fame and fortune would arrive for Defendant.

35. The only problem with Defendant's plan to mimic McNamara's success was was that the culprit in *I'll Be Gone in the Dark* was actually guilty of murder, while the "culprits" in Defendant's proposed book (i.e., the Shumans) are guilty of nothing more than failing to conform to gender stereotypes and being victimized by powerful men. In the classic logic of the witch hunt, their apparent innocence is proof of their guilt, requiring the intrepid investigator to seek out ever-more dubious sources for evidence of their crimes. Plaintiff observed this process at work in Defendant's conversations and correspondence with him in the fall of 2019, by which time he realized Defendant, had developed a terrifying, violent, obsessive antipathy toward the Shumans — particularly transgender Mischa.

36. In short, the parties were completely incompatible as co-authors because their objectives for a book were diametrically opposed. Defendant, but not Plaintiff, had known this from the beginning; he had believed her when, a year earlier, she falsely stated that she wanted

to be his co-author and shared his vision for a serious, balanced work of nonfiction.  Why, then, did she deceive him into entering and adhering to their co-authorship agreement?

37.    The question practically answers itself: Defendant wanted to prevent Plaintiff from writing his own book, or co-authoring a book with someone else, which might well hit the market before her own planned book was completed.  However, most crucially, Defendant wanted to steal the voluminous documentary material, information, and intellectual labor from Plaintiff which without which she would be in no position to write a book. Plaintiff was ready to begin to begin work on his own book, with or without a journalistic co-author, in the fall of 2018. Defendant, in contrast, also had contractual obligations with *New York* Magazine that would keep her tied up until the summer of 2019.  If Plaintiff had gone through with his plan of writing a book beginning in fall 2018, his book would at the very least have competed with the book she would begin writing nearly a year later. Worse still, Plaintiff's book might have discredited her book altogether, or have prevented from being published at all.

38.    The solution to this problem, Defendant saw, was to feign interest in co-authoring Plaintiff's book, while getting him to sit on his hands until the following summer, and most crucially plotting to fraudulently obtain material, information, and intellectual labor from Plaintiff, when they would supposedly begin their joint work.  In this way, Defendant used the co-authorship agreement not as a means of jointly producing a book, but of ensuring that Plaintiff did not write a book that would rival (or worse, kill outright) her own planned "true crime" potboiler and fraudulently obtain materials and information as well as intellectual contributions from Plaintiff that were essential to her for any book she would attempt to write on this matter. Defendant's repeated and extreme sexual harassment and manipulation of

Plaintiff also meant that he was worried to do anything that would upset Defendant or go against her wishes.

39.     Then, in the summer of 2019, when she became available to begin joint work, she breached the agreement — as she had planned to all along — in order to get a contract for the book she really wanted to write. Plaintiff, meanwhile, had lost a year of writing time, had given up the opportunity to seek a different co-author, and would not be able to publish until well after Defendant's putative "blockbuster" had appeared, and suffered the theft of a vast amount of material and intellectual property.

40.     Defendant's book remains unpublished, but Defendant's social media pages are still touting the book as "forthcoming."  On information and belief, her contract with HarperCollins remains in force.

41.     In October 2019, Bolonik shared with Plaintiff that the Shumans' counsel had reached out to HarperCollins and were "trying to stop the book from being published". Bolonik was very disparaging to HarperCollins's legal team calling them "weak sauce" because they had expressed concerns about the book.

42.     Plaintiff's losses from Defendant's breach include the following.

43.     First, Plaintiff lost the opportunity to be the first to reach the book market on the subject of his story.  If Defendant had not tricked him into agreeing to hold off writing his book until after her articles were complete, Plaintiff (with or without another co-author) would have signed a book contract in the fall of 2018.  He would have received an advance, presumably comparable to the one Defendant later received, and would have earned the royalties that accrue to the first book published.

44.     Second, because Defendant deceived him into waiting and then breached the co-authorship deal, Plaintiff's ability to produce a marketable book dropped substantially.  Being the first to get a contract on the subject, Defendant obtained the "first mover" advantage. Moreover, she had deceived him into sharing all the written materials, thoughts, memories and secrets that would have formed the core of his book, but were now largely hers to exploit. Several agents told Plaintiff not to waste his time trying to get a book contract on the subject so long as Defendant's HarperCollins project was in the works, much less after her book appeared (if it did); she had stolen his thunder, stolen his documents, information, and intellectual labor, and no publisher would be interested in publishing a book that went over the same ground using the same materials she had fraudulently obtained from him.  By adhering to their agreement before Defendant violated it, Plaintiff had made himself effectively unpublishable on the subject.

45.     Third, Plaintiff is entitled to half of the advances that HarperCollins paid Defendant upon her signing their publication agreement.  The parties had agreed that they would work together as co-authors, and share equally the proceeds that came from the work. Plaintiff had fully complied with the agreement up to that point, including giving her the written materials and other private information that she used in her book proposal to land the HarperCollins contract.  The fact that she proceeded to breach the contract by cutting him out of the deal does not free her of the obligation to split the proceeds as they had agreed. Plaintiff's losses from the breach therefore include half of whatever six-figure amount (she has never disclosed the exact figure) the publisher paid as an advance as well as the significant lost income that Plaintiff's book would have generate had he not been defrauded by Defendant.

46.     Eventually, Plaintiff could not stand by as Defendant's theories about the

Shumans grew more and more unhinged and pathological and as she continued to disseminate

falsehoods about them. Upon reviewing his notes and documents, he was shocked at the extent

Bolonik had pressed him to adopt her own false view of the story and decided that he needed to

alert parties involved of her unconscionable actions and that he was retracting his participation

in all of Bolonik's work past, present or future. The extreme verbal and physical sexual

harassment of Plaintiff by Defendant was also becoming increasingly intolerable.

47.     In June 2020, on multiple occasions, Plaintiff wrote to HarperCollins saying he

wanted to inform them of her outrageous, unethical conduct. He pointed out the lies that

Bolonik was spreading and the serious issues in her reporting of the story. He said he hoped

that HarperCollins would "not become the latest vehicle in her false and defamatory attacks on

two women whose lives she seeks to destroy." He also informed them that he had retracted his

story. No one responded to his outreach and Plaintiff followed up with further emails

expressing outrage at the lack of concern they were showing.

48.     At this time, Plaintiff also reached out to Sarah Burnes, Bolonik's literary agent

urging her to "examine the evidence and do the right thing."

49.     In March 2021, Plaintiff had not received a substantive response from the

publisher so he wrote to them again. He notified HarperCollins that Bolonik continued to state

on her social media profile that the book was forthcoming. He also forwarded them

documentation that detailed the repeated sexual harassment that Bolonik had subjected Hay to

during her reporting. He told the publisher that he was disgusted that HarperCollins not taking

a more clear position on an author who subjected a source to such abuse.

50.     Four days later HarperCollins responded saying that they were aware of his

correspondence but had not published any material by Bolonik and therefore there could be no legal claim against HarperCollins.

51.     Plaintiff's counsel at the time, Attorney Jillian Weiss, wrote to HarperCollins forwarding some communication between Plaintiff and Bolonik's book agent, The Gernert Company, regarding serious concerns about Bolonik and the book deal with HarperCollins. Weiss reiterated that Bolonik had pending lawsuits relating to the articles on which the book deal is based and pointed to details of the extreme and pervasive sexual harassment by Bolonik of Plaintiff. Weiss wrote HarperCollins had been made aware, by Plaintiff, of Bolonik's commitment *in writing* to ruin Shumans' lives through her book.

52.     Receiving no response from HarperCollins, Weiss wrote again saying that Plaintiff was disappointed that there had been no interest from HarperCollins to investigate Bolonik's conduct in the reporting including the sexual harassment of Hay by Bolonik.

53.     Even after multiple attempts by Plaintiff to warn third parties about Bolonik's outrageous conduct, Bolonik continued to be supported in her efforts to publish salacious lies about the Shumans, and therefore continued the harms to Plaintiff. In September 2021, HarperCollins wrote back that Bolonik was still "in the process of writing" the "unpublished work" that would address a variety of topics including the articles. They also wrote that that any concerns about alleged acts of sexual harassment by Bolonik of Hay should be made in writing.

54.     At the beginning of 2022, Plaintiff, through counsel, wrote to HarperCollins detailing in writing the sexual harassment he suffered at the hands of Bolonik. He also wrote that he believed that HarperCollins had been deceived into thinking that the book would be a serious work of nonfiction when it was actually a salacious collection of untruths masquerading

as journalism.  Plaintiff notified HarperCollins that their planned book by Bolonik was also

produced as a result of fraud, theft, and violation of intellectual property rights and life rights.

Plaintiff has still not received a reply from HarperCollins.


**Defendant's Sabotage of the Television Deal**

55.     In July 2019, while Defendant was still pretending that they were to be co-

authors, Plaintiff was contacted by a number of Hollywood producers who expressed interest in

buying the rights to make a movie or television series about his experiences.  Plaintiff

explained that Defendant was his co-author on a book about the subject, and that she should be

part of the conversation. The parties were also contacted by United Talent Agents ("UTA"), a

Hollywood agency.  The UTA representatives proposed, for a commission, to line up an

appropriate creative team (producer, director, writers, etc.) for a television series, which they

considered preferable to a movie about the story; to "pitch" the project to Hollywood studios in

order to get a contract offer; and to present Plaintiff and Defendant with the best of the

resulting offers.  This process would take several months, according to the UTA

representatives.  In a joint phone call, the parties accepted the UTA representatives's proposal.

56.     That fall, UTA assembled a creative team, wrote out a summary of the

contemplated television series, and pitched the project to a number of studios, requesting

contract bids from each of them.

57.     Throughout the fall and winter of 2019-2020, Defendant — acting behind

Plaintiff's back — repeatedly contacted the UTA representatives, giving them her "true crime"

version of and sharing her increasingly unhinged theories of the Shumans, including the notion

that Mischa was a leading a "cult" and had "brainwashed" the others in her family. (Prejudiced

17

people often accuse transgender individuals of constituting a "cult" that "brainwashes" the "normal" people around them; this accusation was once common currency among those prejudiced against gays and lesbians.)

58.     In March 2020, as it had promised, UTA sent both Plaintiff and Defendant a contract offer for a series to be produced (at its option) by a major television studio.  The contract offered to buy Plaintiff's "life rights" for six-figure amount, and also offered to hire both Plaintiff and Defendant as paid "consultants" for the series.  By this time, Plaintiff knew about Defendant's attempts to twist the series in the direction of her deranged imaginings about the Shumans.

59.     A few weeks later, Plaintiff had a phone conversation with one of the project's producers.  Plaintiff explained that the "true crime" tales that Defendant had been peddling to UTA — the deviant women who prey on innocent men, the transgender "cult" led by Mischa, and the rest — were sheer fantasy, lacked any credible evidence, and were essentially the continuation of a witch hunt certain enemies of the Shumans had been conducting against them for years. Plaintiff said he would have nothing to do with a production that took seriously any of these accusations against the Shumans; he added that the production's actual focus should be on people's tendency to demonize the women, and to believe the worst about them, merely because they did not conform to gender norms.

60.     In June 2020, Plaintiff wrote to UTA officially notifying them that he had "retracted all participation from Bolonik's past, current, or future work and will no longer be part of this travesty. This unequivocal and complete retraction applies to any of Bolonik's film and TV projects as well." He wrote that he hoped that UTA would "not become another vehicle

in [Bolonik's] false and defamatory attacks on two women whose lives she seeks to destroy."

61.     The parties' agreement required them to insist that, in any Hollywood

production they were involved in, the presentation of the story be based in fact and free of

negative stereotypes.  Defendant never had any intention of complying with such a term, which

was totally at odds with the pulpy "true crime" blockbuster from which she hoped to make

millions.  Plaintiff's resulting losses include the following.

62.     First, had Defendant not deceived Plaintiff into assenting to an agreement she

had no intention of following, Plaintiff would have had the opportunity to profit from a TV or

movie production with no involvement from Defendant. As in the case of the book, in fall 2018

Plaintiff's story would have had little trouble attracting Hollywood's interest in such a timely

and controversial subject. A sale of his life rights and a job as a consultant in the resulting

production would have been a foregone conclusion.

63.     Second, if Defendant had complied with the agreement, she would not have

pushed her "true crime" fantasies on UTA, which violated her promise in the agreement.  After

she broke that promise, she all but guaranteed that UTA would withdraw the contract it had

offered the parties, because it must have been clear to UTA that there would be nothing but

strife between Plaintiff and Defendant acting as "consultants." Defendant's breach effectively

killed the production, depriving Plaintiff of the sale of his "life rights" and whatever income he

would have earned as a consultant.

64.     According to several well-placed industry insiders Plaintiff has spoken to, the

conflict between Plaintiff and Defendant circulated widely in Hollywood gossip networks,

making a production on the subject of Plaintiff's story a near-impossibility.  Thanks to

Defendant's deception, Plaintiff has lost the chance to earn what would have been a sure thing.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract
### [Book Deal]

65.    Plaintiff repeats and re-alleges each of the foregoing paragraphs.

66.    Defendant lured Plaintiff into a co-authorship agreement, which she had no intention of keeping, in order to prevent him from outpacing her to the market for a book about his story.

67.    The agreement provided, among other things, that Plaintiff and Defendant would jointly write the book, would both have final editorial control over the manuscript, would ensure that the book met the highest journalistic standards, would share equally in the remuneration from the project, and would act to ensure that any movie or television production involving them would be fact-based and free of invidious stereotypes.

68.    Defendant assured Plaintiff that she intended to abide by the agreement, when the opposite was true.

69.    Defendant sexually harassed Plaintiff and manipulated him into telling lies about the Shumans while Plaintiff believed that Defendant and he were working on the project jointly. Defendant threatened his career and his reputation if he did not comply with her requests.

70.    Defendant broke the agreement when, in September 2019, she signed a publication deal with HarperCollins LLC for a book on the very subject of the book she had promised to co-author. The contract cut Plaintiff out of the deal entirely; he was to have no authorial or editorial rights, and was to receive none of the book's earnings.  Defendant collected a large advance from the publisher upon signing, which she concealed from Plaintiff and which she kept entirely for

herself, sharing none of the money with him.

71.    Defendant's conduct constitutes breach of contract, which caused Plaintiff financial losses in several respects.

72.    First, had she not deceived him with an agreement she had no intention of abiding by, he would have obtained a book publication contract in the fall of 2018, thus gaining the advantage of being the first to reach the book market on a subject that was likely to appeal to a broad audience.  His previous book, a 200-plus page tome on a complex area of international law and the laws of different countries, had taken him 16 months to write before its 2017 publication. There can be little doubt that, had he started his book (with or without a different journalistic coauthor) in the fall of 2018, it would have reached the market well before a book commenced a year later by Defendant.  Given the topicality of the subject, such a book by Plaintiff would have had widespread appeal.

73.    Second, by breaching the agreement, Defendant ensured that any book written by Plaintiff would be the second one on the same subject, using the same extensive materials and information as well as intellectual contributions that Plaintiff had entrusted to Defendant explicitly for their contractual joint project. As noted above (para. 37), Plaintiff would have had trouble even getting a publishing contract so long as Defendant's HarperCollins deal was in place.

74.    Third, Plaintiff was deprived of his half of the advance collected by Defendant. to which he was contractually entitled as well as considerable loss of earnings from a book he would have written have he not been defrauded by Defendant.

## COUNT TWO
## Breach of Contract
## [Television Deal]

75.     Had Defendant not deceived Plaintiff into assenting to the co-authorship agreement, he would not only have been the first to write a book about the subject; he would likely have received offers to sell his life rights and serve as a paid consultant for a movie or television series based on his story, with no involvement of Defendant and no money taken by her.

76.     The conflict between the parties resulting from Defendant's breach became the subject of gossip in Hollywood, making it a virtual impossibility that anything will be produced about Plaintiff's story.  He is thus deprived of future opportunities to sell his life right and earn consulting fees for the story.

## **PRAYER FOR RELIEF**

Defendant's deceptions and betrayals have caused Plaintiff losses well in excess of $75,000.  Plaintiff requests damages not less than that amount to be determined at trial, together with costs, interest, and such other relief as the Court finds just and proper.

September 29, 2023

Respectfully submitted,


/s/ Bruce Hay
1309 Beacon St., Ste 300
Brookline, MA 02446
(617) 290-5083
brucelawhay@proton.me