UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRUCE HAY,

                        Plaintiff,

        -v-

KERA BOLONIK,

                        Defendant.

23-CV-8584 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Bruce Hay, proceeding *pro se*, brings this action against Defendant Kera Bolonik, alleging that she breached a contract between them by entering into a book deal without Hay's knowledge or permission. Further, Hay states that this breach prevented him from writing his own book and selling the rights for a movie or television series based on the story.

Before the Court is Bolonik's motion to dismiss for failure to state a claim. For the reasons that follow, the motion to dismiss is granted.

**I.  Background**

    **A.  Factual Background**

The following facts are drawn from the allegations in Hay's complaint (*see* ECF No. 1 "Compl."), which are presumed true for the purpose of resolving Bolonik's motion to dismiss. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Plaintiff Bruce Hay, "for many years a professor at Harvard Law School" (Compl. ¶ 6),[1] is a published author in the legal field (*id.* ¶¶ 17, 72). Defendant Kara Bolonik is a freelance author and former writer and editor at *New York* Magazine. (*Id.* ¶ 5.)

---

[1] For ease of reference, the Court refers to the page numbers automatically generated by ECF at the top of each filing.

Hay and Bolonik began discussing a book project together in 2018. (*Id.* ¶¶ 17-18.) Bolonik had been working on two articles for *New York* Magazine about Hay's relationship with "two formerly close friends," Maria-Pia Shuman and her spouse Mischa Shuman ("the Shumans"), and Hay notified Bolonik that he was "planning to write a book about his experiences with the Shumans and the controversy surrounding them." (*Id.* ¶¶ 15, 17.) The book, Hay envisioned, would "deriv[e] from" Bolonik's articles, and "some portions of the articles might (or might not) make it into the book." (*Id.* ¶¶ 6, 23.)

Upon learning of Hay's potential book, Bolonik "strongly urged him to take her on as a co-author," citing her "journalistic experience" in interviewing sources and writing for the general public. (*Id.* ¶ 18.) Hay was persuaded to take Bolonik on as a co-author for his book project because the two had mutual friends, Bolonik had "publicly professed to share the same feminist and pro-transgender rights sympathies" that Hay harbored and would be relevant to the book, and Hay believed that Bolonik would adhere to high standards of journalistic ethics. (*Id.* ¶ 20.) After sharing these reasons with Bolonik, Hay agreed to engage her as a co-author. (*Id.* ¶ 21.) The two also discussed the possibility of continuing this arrangement for future media projects the book might spawn. (*Id.* ¶ 22.)

According to Hay, in early 2019, through "phone calls and exchanges of correspondence," he and Bolonik entered into an agreement about the co-authorship. (*Id.* ¶ 23.) The terms of this agreement included:

> (1) the parties would co-author a book on Plaintiff' [sic] experiences with the Shumans and the surrounding circumstances of their lives known to Plaintiff;
> (2) neither party would write their own book on the subject, and neither would seek out another co-author, without first getting the other's permission;
> (3) work would begin on the book as soon as Defendant's articles were finished, although some portions of the articles might (or might not) make it into the book;
> (4) the book would be a serious work of investigative journalism, adhering to the standards [outlined earlier in the Complaint];

(5) the finished product would have to be satisfactory to both of them before final publication;
(6) that they would share equally the duties of evidence gathering, with Plaintiff primarily responsible for collecting documents and Defendant primarily responsible for interviewing sources;
(7) that they would share equally the duties of writing the manuscript;
(8) that they would share equally all proceeds from the book and from any movie or television representations of the story;
(9) if a movie or TV deal materialized, Plaintiff and Defendant would insist to its creators that the production was based on fact, did not fabricate stories, and did not contain invidious stereotypes.

(*Id.*)  Before and after the parties reached this agreement, in anticipation of the joint book project, Hay shared with Bolonik private documents, "secrets about himself and his family," and details about his relationship with the Shumans and other key players in the story.  (*Id.* ¶¶ 24-25.)

Over time, Hay alleges, his relationship with Bolonik soured.  (*Id.* ¶¶ 26-31.)  Bolonik made Hay feel uncomfortable with "sexual advances" he rebuffed and a hostility toward the Shumans that Hay no longer shared.  (*Id.* ¶¶ 26-28.)  He states that Bolonik "had developed a terrifying, violent, obsessive antipathy toward the Shumans," and primarily toward Mischa, the transgender spouse.  (*Id.* ¶ 35.)

### 1. Book Contract

In August of 2019, unbeknownst to Hay, Bolonik wrote a separate book proposal and circulated it to publishers with only her name on it.  (*Id.* ¶ 32.)  About a year later, she sold her book proposal to HarperCollins.  (*Id.*)  Hay was not involved in the transaction, was not named as an author, and, based on the terms of Bolonik's contract, would not receive any royalties or proceeds.  (*Id.*)  In fact, Hay only learned about the sale a week afterwards from a third party.  (*Id.*)

Further, Hay states, Bolonik's proposed book did not live up to the description on which the two had agreed the year before.  Instead, the book would "falsely portray[] [Hay] as hot on the trail of two deviant women, one of them transgender, who go around victimizing innocent

3

men while escaping the notice of police." (*Id.* ¶ 34.) Bolonik told Hay that one of her goals was to "lead law enforcement to see what it had overlooked and (hopefully) incarcerate the women and take away their children." (*Id.*) Such animosity against the Shumans particularly worried Hay, and he determined that his vision for the book was "diametrically opposed" to Bolonik's. (*Id.* ¶ 36.)

Hay alleges that Bolonik never intended to uphold their 2019 agreement to co-author the book the two had discussed. (*Id.* ¶ 33.) Rather, Hay contends, Bolonik entered into the agreement only to prevent Hay from authoring his own book and thus competing with the book Bolonik planned to publish solo. (*Id.* ¶ 37.) Further, their agreement enabled Bolonik to access information and documents of Hay's that would be crucial for her to tell this story. (*Id.*)

### 2. Television Deal

In July 2019, Hay was contacted by several Hollywood producers who were interested in buying the rights to the future book. (*Id.* ¶ 55.) Bolonik and Hay mutually agreed to work with United Talent Agents ("UTA"), an agency that would pitch Hay's story to various television studios. (*Id.*)

A few months later, Bolonik began contacting UTA representatives without Hay's knowledge and changing the premise of the proposed television series. (*Id.* ¶ 57.) According to Hay, Bolonik reframed the story as a "true crime" tale involving Mischa Shuman as a cult leader and brainwasher, portrayals that Hay was concerned played into harmful tropes about transgender people. (*Id.*)

In March 2020, UTA sent Bolonik and Hay an offer from "a major television studio" to buy Hay's rights to the story for a "six-figure amount" and to hire Bolonik and Hay as paid consultants for a television series. (*Id.* ¶ 58.) However, by this point Hay had realized that his and Bolonik's visions for the series were incompatible, and he was concerned about the "witch

4

hunt" against the Shumans that could result from the series' being manipulated by Bolonik. (*Id.* ¶ 58.) In June of 2020, Hay notified UTA that he would not participate in any joint projects with Bolonik due to these concerns. (*Id.* ¶ 60.)

Hay alleges that because UTA must have picked up on the "strife" between Bolonik and Hay, UTA withdrew the contract and Hay was thus unable to collect on the rights and income from the series. (*Id.* ¶¶ 62-63.) Further, Hay has learned from "several well-placed industry insiders" that rumors about the conflict between Bolonik and Hay had "circulated widely in Hollywood gossip networks," which Hay believes will make a future television production of his story unlikely. (*Id.* ¶ 64.)

### B. Procedural Background

#### 1. Prior Litigation

The Court takes judicial notice of the electronic filing records from *Hay v. New York Media LLC*, No. 20-CV-6135 (JPO), 2021 WL 2741653 (S.D.N.Y. July 1, 2021) ("*NY Media*"), *aff'd*, No. 21-1727, 2022 WL 710902 (2d Cir. Mar. 10, 2022), and *Hay v. Gernert Company, Inc.*, No. 22-CV-698 (LGS), 2023 WL 402511 (S.D.N.Y. Jan. 25, 2023) ("*Gernert*"), two closely related cases at issue in Bolonik's motion to dismiss. (ECF No. 11 ("Mem.") at 9-14.) While "[g]enerally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), courts ruling on a *res judicata* defense may take judicial notice of relevant court documents filed in previous cases, *see Morales v. New York City Dep't of Educ.*, 808 F. App'x 35, 36 n.1 (2d Cir. 2020) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, . . . to establish the fact of such litigation and related filings.")).

Hay commenced a previous breach of contract claim against Bolonik in *NY Media* in 2020.  (*See* ECF No. 9-2 at 1, 47-48.)  In *NY Media*, Hay alleged that Bolonik breached a 2018 oral contract regarding the journalistic standards, professionalism, and thoroughness with which Bolonik would approach the two *New York* Magazine articles she was writing about Hay's relationship with the Shumans.  (*Id.* at 47-48.)  Further, Hay agreed to "cease communications" with other media outlets about his story and "to work exclusively with Bolonik and *New York* Magazine." (*Id.* at 21.)  This Court ultimately dismissed *NY Media* for failure to state an actionable claim, a ruling that was affirmed by the Second Circuit.  (Mem. at 11.)

About six months after this Court's decision in *NY Media*, Hay filed suit in *Gernert*.  (*Id.*)  In his second amended complaint, Hay alleged that his book agency breached its fiduciary duty by cutting him out of a book deal and allowing Ms. Bolonik to be the sole author on the HarperCollins contract for the story about Hay's relationship with the Shumans.  (ECF No. 9-6 at 1-2, 14-16.)   Hay sought to amend his complaint a third time to name Bolonik as a defendant and include the same breach of contract claim he brings before the Court now.  (Mem. at 13.)  Ultimately the court denied Hay's motion to amend (ECF No. 9-9 at 1), and the parties later reached a settlement of that case (*Gernert*, ECF No. 96).

### 2.     Present Action

Hay commenced this action on September 29, 2023, asserting breach of contract.  (ECF No. 1.)  Bolonik subsequently filed a motion to dismiss Hay's complaint on February 21, 2024 (ECF No. 8), arguing primarily that Hay's claims are precluded by the two other cases Hay litigated in this District, and, in the alternative, that Hay failed to adequately state a claim for breach of contract.  (Mem. at 14-15, 18.)  Additionally, Bolonik moved, pursuant to 28 U.S.C. § 1651, for the Court to permanently enjoin Hay from commencing any actions based on the facts alleged in this case or the previous cases Hay has litigated in this District without prior

approval from this Court.  (ECF No. 8.)  Hay filed an opposition to the motion to dismiss and enjoin on June 5, 2024 (ECF No. 21 ("Opp.")), and Bolonik filed a reply in support of her motion on June 27, 2024 (ECF No. 22).

**II.     Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, a complaint will be dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  In ruling on a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Hay is litigating his case *pro se*.  "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020).  Accordingly, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted).  However, "the degree of solicitude may be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010).  Hay asserts that he was "for many years a professor at Harvard Law School" (Compl. ¶ 6), and is the author of "a 200-plus page tome on a complex area of international law and the laws of different countries" (*id.* ¶ 72).

Further, in his previous appearance before this Court, he stated that he taught "Civil Procedure and related subjects." (ECF No. 9-2 at 2.) Because of Hay's extensive experience in the law, and subject-matter expertise in federal civil procedure, the Court does not afford him the same solicitude traditionally given to *pro se* litigants with no legal background.

### III. Discussion

#### A. *Res Judicata*

The threshold issue in Bolonik's motion to dismiss is whether Hay's breach of contract claims are barred by the preclusive effects of the recent lawsuits he has filed in this District. "[R]*es judicata*, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Monahan v. New York City Dep't. of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (internal quotation marks omitted). A claim is precluded from subsequent litigation if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Id.* at 285.

Bolonik first argues that Hay's current action is barred by his previous litigation in *NY Media*. (Mem. at 15.) Hay does not contest the first two requirements of *res judicata*: that *NY Media* was a final judgment on the merits and that it involved Hay suing Bolonik. (Opp. at 6-10.) Thus, whether or not Hay's claims are precluded here hinges upon whether "the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan*, 214 F.3d at 285.

New York[2] uses "the transactional analysis approach" in determining whether a claim could have been raised in prior litigation. *O'Brien v City of Syracuse*, 54 N.Y.2d 353, 357 (N.Y. 1981). Determining whether claims are part of the same transaction is "[a] 'pragmatic' test," *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 100 (N.Y. 2005), and "turns on whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties expectations or business understanding or usage," *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Mach. Corp.*, 110 F.4th 106, 114 (2d Cir. 2024). Ultimately, New York's approach to *res judicata* dictates that "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien*, 54 N.Y.2d at 357.

Hay's claims in *NY Media* and the current case arise out of two different alleged contracts. In *NY Media*, Hay alleged breach of a 2018 contract with Bolonik regarding the approach she would take in writing the two *New York* Magazine articles about Hay's relationship with the Shumans ("2018 contract"). (ECF No. 9-2 at 20-21, 47-48.) In the current case, Hay alleges breach of a 2019 contract with Bolonik regarding book and television series collaborations focusing on the same story ("2019 contract"). (Compl. ¶¶ 17, 23, 65-76.) Hay, in his opposition to Bolonik's motion to dismiss, portrays these two contracts as "completely separate and different" with "virtually no overlap in the issues at stakes [sic] . . . or in the

---

[2] "The law governing the doctrine of *res judicata* in a diversity action is 'the law that would be applied by state courts in the State in which the federal diversity court sits.'" *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). Thus, it is proper to look to New York state law to determine the contours of the *res judicata* test.

evidence relevant to them." (Opp. at 8.)  Hay instead contends that *NY Media* was "a journalistic malpractice suit" while the current case is "a misappropriation suit." (*Id.* at 7-8.)

But what Hay fails to acknowledge is the significant overlap in underlying facts that gave rise to both the 2018 and 2019 contracts.  The two contracts are for related artistic collaborations between Hay and Bolonik to depict essentially the same story of Hay's complicated relationship with the Shumans.  (*Compare* ECF No. 9-2 at 2 ("In July 2018, Plaintiff entered into a contractual agreement to work with . . . Bolonik[] on an article for the Magazine about his dispute with the Shumans.") *with* Compl. ¶ 17 ("In September 2018, while Defendant was getting started on the articles that would appear next summer, Plaintiff informed her that he was planning to write a book about his experiences with the Shumans and the controversy surrounding them.").)  Hay himself admits in his complaint that the 2019 contract "deriv[es] from articles Bolonik had published about Mr. Hay's life in *New York* Magazine." (Compl. ¶ 6.)  And he further notes that "some portions of the articles might (or might not) make it into the book." (*Id.* ¶ 23.)

Further, Hay had every opportunity to include this 2019 breach of contract claim in the action he filed against Bolonik for breaching their 2018 contract.  Hay first filed suit in *NY Media* against Bolonik in August of 2020.  (*NY Media*, ECF No. 1.)  This was months after he allegedly became aware that Bolonik had violated their 2019 contract for both book co-authorship and a television series collaboration.  (Compl. ¶¶ 32, 58-59.)  And notably, Hay's complaint in *NY Media* is peppered with references to the book deal and possible television series he is suing about in the present action:

- The idea was that such a salacious "True Crime" story would quickly win wide circulation and notoriety, leading to a book and movie and/or television series – which would bring . . . name recognition to the unknown Bolonik.  (ECF No. 9-2 ¶ 8.)

10

- Calls from Hollywood started pouring in, and Bolonik's literary agent began auctioning the rights to publish a book-length version of the article. (*Id.* ¶ 11.)
- Following publication of the resulting article in the summer of 2019, [Hay] helped Bolonik and New York Media promote the article and defend it from legal attacks; helped Bolonik explore movie and TV deals based on the article; and helped Bolonik begin [to] work on her book based on the article. (*Id.* ¶ 82.)
- Bolonik's editors and supervisors shared her hope that her article, if it generated enough buzz, would lead to a book and/or movie and/or TV series labeled as being "based on" the article, which would redound to the benefit of New York Media as well as Bolonik herself. (*Id.* ¶ 100.)
- In July 2019, Bolonik announced to Plaintiff she was considering the idea of expanding the articles into what she called a "True Crime" book. She pretended to have just spoken with her literary agent Sarah Burnes about this idea for the first time. In fact, she had planned all along to publish such a book, had written the articles with that objective, and had frequently discussed the idea with Burnes ever since beginning her reporting. (*Id.* ¶ 125.)
- In September 2019, Bolonik informed Plaintiff that the Harper Collins [sic] publishing house had agreed to publish her proposed book, which was to be entitled *Gullible*. She persuaded Plaintiff to continue working with her, and not to work with any other journalists, as she completed the book. (*Id.* ¶ 127.)

Hay argues that, despite the overlap in factual "background" between the case at hand and *NY Media*, bringing the contract claims together would not have made for a "convenient trial unit" because "[i]t would have multiplied the issues and added testimonial and documentary evidence with no bearing on the New York Media dispute." (Opp. at 8-10.) The New York Court of Appeals has looked to several different factors in the "pragmatic" determination of whether the facts of two different claims "form a convenient trial unit," including the purpose of the actions, the type of relief sought, whether the trial will be a bench or jury trial, and whether the two claims are "sufficiently intertwined" such that they could "be fairly and efficiently resolved" in tandem. *See Xiao Yang Chen*, 6 N.Y.3d at 100-01.

*NY Media* and the present case both seek to rectify economic harms Bolonik allegedly caused Hay by misleading him in their artistic collaborations surrounding the re-telling of a

11

single narrative: his relationship with the Shumans.  (Compl. ¶¶ 71-76; ECF No. 9-2 at 48.)  Both actions demand money damages in excess of $75,000.  (Compl. at 22; ECF No. 9-2 at 51.)  And Hay demanded a jury trial in both.  (Compl. at 1; ECF No. 9-2 at 1.)  Given the significant factual overlap between the written collaborations, including identical subject matter, a shared timeline for when the articles and book were being researched and workshopped, and the same two parties involved, the witnesses and evidence presented would have largely overlapped.  (*See* Compl. ¶¶ 17, 23; ECF No. 9-2 at 20-21.)  Considering all these factors, the two cases are "sufficiently intertwined" such that they easily could have been tried together.  *See Xiao Yang Chen*, 6 N.Y.3d at 100-01.

       Hay defends his decision to delay his 2019 breach of contract claims, arguing that litigating the claims separately was essential to prevent "confusing a jury already flooded with information and conflicting testimony about the magazine articles and their production."  (Opp. at 9-10.)  But Second Circuit precedent is clear that "[l]itigation strategy to not bring claims . . . does not bar the application of *res judicata*; indeed, 'strategic' choices to split claims that could be brought in the same case is what the *res judicata* principle seeks to prevent." *Universitas Educ., LLC v. Benistar Admin Servs., Inc.*, No. 23-CV-1207, 2024 WL 1787754 at *3 (2d Cir. Apr. 25, 2024) (citing *Duane Reade*, 600 F.3d at 199 ("Where a litigant selected a litigation strategy he now regrets, . . . his choice of that strategy will not prevent the application of preclusion against him.")).

       "The doctrine of *res judicata* . . . was established as a means to promote legal economy and certainty."  *Monahan*, 214 F.3d at 286.  Hay has had his day in court to challenge Bolonik's actions in their joint artistic collaborations re-telling Hay's complicated relationship with the

Shumans. He may not continue to re-litigate the claims he could have, and should have, brought at that time.

*Res judicata* based on this Court's dismissal in *NY Media* bars Hay's action in front of the Court today. Therefore, Bolonik's alternative theories of dismissal in her motion to dismiss, including *res judicata* based on *Gernert* and failure to adequately allege breach of contract, need not be reached.

### B. Permanent Injunction

In addition to her motion to dismiss Hay's claim, Bolonik has moved to "permanently enjoin and restrain Hay from commencing any additional actions or proceedings based on or connected to the facts alleged in the Complaint . . . or other documents he has filed in this case, the NY Media Action or the Gernert Action without first obtaining leave of this Court . . . ." (Mem. at 21.) The Second Circuit has directed district courts to consider five factors "in determining whether or not to restrict a litigant's future access to the courts . . . ." *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986). These include:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Id.* In weighing these factors, "the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Id.*

The present action is Hay's third in front of this District since 2020 regarding the re-telling of his complicated relationship with the Shumans. *See NY Media*; *Gernert*.

13

Bolonik asserts that, because of these actions, she has suffered economic loss in taking time away from her freelance writing, paying for defense attorneys, and losing her book contract with HarperCollins.  (ECF No. 16 at 1-2.)  And though Hay has filed this current action *pro se*, when a legal professional represents himself, the Court "may accord [him] less leniency" than it would for a *pro se* litigant who has no legal background.  *See Carling v. Peters*, 10-CV-4573, 2013 WL 865842, at *2 (S.D.N.Y. Mar. 8, 2013) (citing *Tracy*, 623 F.3d at 102).

Yet these facts alone do not justify enjoining Hay from accessing the judicial system absent express permission from this Court.  Hay's three actions, though closely related in their factual allegations, do not yet indicate a pattern of "vexatious litigation" that would hinder this Court in "its ability to carry out its constitutional functions."  *See Safir*, 792 F.2d at 24.  Further, the Second Circuit has urged courts to exercise caution to avoid ordering overly broad injunctions that could "foreclose what might be a meritorious claim."  *Id.* at 25; *see also Duran v. Kiley*, 586 Fed. App'x. 598, 600 (2d Cir. 2013) (summary order) (holding that a district court did not abuse its discretion in imposing a filing injunction because, in part, the injunction was sufficiently narrow and limited to future S.D.N.Y. complaints related to a specific construction project).  Bolonik urges the Court to enjoin Hay from filing any further actions "connected to the facts" of any of his three cases before this District.  (Mem. at 21.)  Rather than targeting a discrete claim such as breaches of the 2018 or 2019 contracts between Bolonik and Hay, such an injunction could also cover possibly meritorious claims.

For these reasons, the Court denies Bolonik's motion to enjoin at this time.  However, Hay is cautioned not to take this denial as encouragement to file future

14

frivolous lawsuits. In addition to facing a potential permanent injunction if his litigation does become vexatious, such action could open Hay to liability for judicially imposed sanctions. *See* Fed. R. Civ. P. 11(c).

### IV. Conclusion

For the foregoing reasons, Bolonik's motion to dismiss is GRANTED, and the complaint is dismissed with prejudice. Bolonik's motion to enjoin is DENIED without prejudice to renewal.

The Clerk of Court is directed to close the motion at ECF Number 8, to enter judgment of dismissal, and to close this case.

SO ORDERED.

Dated: September 3, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge